11/16/20  In re Annika B. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re ANNIKA B. et al., Persons Coming Under Juvenile Court Law. | B303480 (Los Angeles County Super. Ct No. 19CCJP06630A-D) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ROXANA B., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, D. Brett Bianco, Judge.  Affirmed.

Emery El Habiby, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of the County Counsel, Mary C. Wickham, County Counsel, Kristine Miles, Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

The juvenile court declared the four minor children of appellant Roxana B. (Mother) dependents of the court, after sustaining a dependency petition under Welfare and Institutions Code section 300, subdivisions (a), (b)(1), (c), and (j) (Section 300(a), (b)(1), (c), and (j), respectively).[1] The petition alleged Mother endangered the children's well-being by physically abusing them, disregarding the emotional and mental health needs of one of the children, and abusing alcohol and marijuana. The court then ordered the children removed from Mother's custody and placed with their father, S.B. (Father).

On appeal, Mother challenges the juvenile court's jurisdictional findings and disposition order, claiming they were unsupported by the evidence. We affirm.

---

[1] All further statutory references are to the Welfare and Institutions Code.

2

## BACKGROUND

### A. *The Family and the Dependency Petition*

The parents have four minor children, Annika B. (born April 2004), Tristan B. (born February 2006), Alana B. (born March 2007), and Tyler B. (born September 2009). At the time of the proceedings, Mother and the children resided in Los Angeles, while Father lived in Riverside County with his girlfriend, Leticia. Father had served a two-and-a-half-year prison sentence, and was released in June 2018. The parents were married but in divorce proceedings, and had joint custody of the children.

On September 11, 2019, the Los Angeles County Department of Children and Family Services (DCFS) received a report alleging that Mother neglected the children, and that the family home was filthy and unsanitary. During its investigation, DCFS learned that on September 14, 2019, Tristan was hospitalized for suicidal ideation. The investigation continued, and on October 11, 2019, DCFS filed a juvenile dependency petition under Section 300(b)(1), (c), and (j). The petition alleged Tristan had mental and emotional problems, including suicidal ideation, and that Mother had failed to ensure he obtained necessary mental health services, placing both the child and his siblings at a substantial risk of harm.[2]

---

[2]     The petition asserted Tristan was at a risk of suffering physical harm under Section 300(b)(1) and emotional damage under Section 300(c). It further asserted under Section 300(j), that the other children were at risk for neglect as siblings of a
*(Fn. is continued on next page.)*

3

On November 27, 2019, DCFS filed an amended petition with additional allegations under Section 300(a) and (b)(1) for Mother's physical abuse of the children with a belt, with a sandal, and by pinching them, and under Section 300(b)(1) for Mother's abuse of alcohol and marijuana. The next week, on December 2, the juvenile court ordered the children detained from Mother and released to Father's custody. The matter proceeded to an adjudication hearing on December 10.

## B. *The Evidence Before the Juvenile Court*
### 1. *DCFS Reports*
#### a. *Physical Abuse*

In November 2018, Mother got into an argument with Tristan, during which she hit Tristan on the head with a book. A mandated reporter relayed information about the incident from Tristan, stating that the book was a hardcover and left a red mark on the child's cheek.[3] According to Tyler, Mother hit Tristan with the book three or four times, on his

---

neglected child. (See Section 300(j) [extending juvenile court jurisdiction to child whose "sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions"].)

[3] Mandated reporters are persons who, due to their positions, are required by law to report all known or suspected cases of child abuse or neglect. (*B.H. v. County of San Bernardino* (2015) 62 Cal.4th 168, 178.)

face, arms, and back.  Alana tried to intervene and protect Tristan, and mother grabbed Alana by her hair and pushed her to the ground.  Alana later recounted her head hitting the door, and Father reported seeing scratch marks on Alana after the altercation, which she told him were caused by Mother during the incident.  Mother admitted "bump[ing]" Tristan on the head with a book, but claimed it was because he got physical with her.

The children later told DCFS that in the past, Mother would hit them with a sandal or a belt.  Alana and Tyler repeatedly told Leticia they could not talk around Mother because she would hit them, and Alana confirmed to DCFS that she feared Mother's temper, because Mother would get irritated easily.

When interviewed in November 2019, shortly before the adjudication hearing, Tyler reported that Mother would now "pop" the children on the mouth with her hand, but still sometimes used a sandal to hit them.  He stated:  "'[The] mouth thing is probably recent.  Alana got hit on her mouth and she got pinched.  [Mother] does that mostly to Alana.  I think this was a couple months back.'"  Tyler noted that Mother also pinched Tristan, that she would pinch the children on their legs, arms, or ears, and that this would sometimes leave marks.  The children reported continuing to fear Mother's anger.

### b. *Mother's Neglect of Tristan's Emotional and Mental Health Issues*

Mother told DCFS that the children began changing after June 2018, when Father was released from prison and a custody dispute between the parents ensued. She reported the children became "withdraw[n]" and demonstrated "anxiety" and lack of interest.

Tristan, then 12, was most affected by the parents' dispute. Mother said his behavior changed, and his grades dropped from As and Bs to Fs. She reported Tristan first spoke about suicide in December 2018. That same month, DCFS recommended that the parents enroll the children in therapy.

In January 2019, Father found a note on Tristan's phone stating that the child felt like killing himself but was too scared. Father tried to enroll the children in therapy in Los Angeles, but Mother said she wanted them enrolled in Downey, where they went to school. Mother claimed she tried to enroll the children in therapy, but insurance issues prevented her from doing so.

Tristan's emotional state remained precarious, with multiple people reporting suicidal comments by him. Tyler stated he heard Tristan say he was going to hang himself or jump off a bridge. Alana confirmed she was aware Tristan had made several comments about suicide. Similarly, Annika confirmed she was aware that Tristan had said he wanted to kill himself. She believed Tristan was "depressed" because of everything that was going on between the

parents.  Annika later expressed concern about his changed behavior.  She noted he used to enjoy school and spending time with family.  Now, Tristan was edgy, did not enjoy school or his family, and would lock himself in his room and play video games.  However, the siblings also stated that Tristan sometimes only joked about suicide, that they did not know if he was being serious, and that they believed sometimes he meant it and sometimes he did not.

On September 10, 2019, the family court ordered the parents to enroll the children in therapy by September 30.  Father then tried to enroll the children in individual counseling in Downey, but Mother refused to sign the consent forms.  A DCFS social worker encouraged Mother to enroll herself and the children in services so the case could be closed, but Mother replied, "'No, this case will not close. Do you hear me? I want this case to stay open.'"

On September 13, Tristan returned from a visit with Father.  According to Mother, the child was very emotional and withdrawn.  When she confronted him, Tristan withdrew further, and became angry and frustrated.  He told Mother he just wanted to sleep.  Mother asked Tristan what he was going to do the next day, as he needed to go to school, and he began shaking his head.  Mother asked if that meant he did not want to wake up, and he apparently nodded.  Taking this as a suicidal expression, Mother called a hotline.  Medical professionals came to the home, spoke to Tristan, and took him to a hospital.  He was released from the hospital hours later.  Speaking to DCFS, Tristan denied

7

feeling depressed or anxious. He admitted saying he wanted to sleep and not wake up, but claimed he meant only that he did not want to go to school.

Mother reported scheduling an intake appointment for Tristan at a mental health clinic on October 15, but claimed they were unable to provide him services. DCFS referred the family for wraparound services to focus on Tristan's mental health, which Mother initially refused.[4] She later agreed to accept those services, but was adamant she was not going to allow anyone in her home. Tristan began receiving wraparound services on November 12.

### c. *Mother's Abuse of Alcohol and Marijuana*

The children discussed Mother's drinking with DCFS. Tristan reported that Mother drank alcohol almost every day. He noted Mother used to leave the children alone while she went out to parties, and would come home around one or two in the morning, looking as though she had been drinking, and smelling of alcohol. His siblings confirmed that on weekends, Mother would go out to drink and party,

---

[4] "'"Wraparound services"'" are '"community-based intervention services that emphasize the strengths of the child and family and include[] the delivery of coordinated, highly individualized unconditional services to address needs and achieve positive outcomes in [the] lives [of the targeted children and families]."' (*In re Andrew J.* (2013) 213 Cal.App.4th 678, 684, fn. 1, quoting § 18251, subd. (d).)

from morning or midday until late at night, leaving Annika to take care of her siblings.  Sometimes, their aunt, Lupe, who lived in the house at the back of the property, would help take care of them, but they only called her if there was an emergency.[5]

Mother once sent an Uber driver to pick the children up from Father's home.  Tristan refused to leave with a stranger without Mother being in the car.  Mother and Lupe then came to pick the children up.  Lupe was driving, and Mother was drunk.  On the drive home, Tyler sat on the floor, without a seatbelt, because he had no room to sit.  According to Leticia, this incident occurred in October 2019.  The children reported that Mother would sometimes fail to pick them up from Father's home, and they sometimes missed school because of it.

The children also discussed Mother's use of marijuana.  Tyler reported seeing Mother smoke, and finding her bag of marijuana.  Alana said she had smelled marijuana on Mother and in Mother's bedroom, and stated that Mother kept marijuana in a bedroom drawer and kept a pipe in the bathroom.  Tristan saw Mother smoke out of a pipe on the porch, and could smell her smoke in her bedroom.  The children reported witnessing "'odd'" behavior by Mother.

---

[5]    All the children reported seeing Mother drinking in the home.  Tyler said that when Mother drank, she had about three beers, and Annika reported that when she once took a sip of Mother's drink, thinking it was juice, the drink turned out to contain alcohol.

They explained that when she came home from work, she would roll around on the floor, laughing to herself, and acting like a child.

Mother told DCFS she drank occasionally like everyone else, but did not have a substance abuse problem. Asked if she ever left the children home alone, Mother stated she would when she worked, but only for a couple of hours. She denied leaving them alone for long periods of time, and claimed that when she had to leave for several hours, Lupe would come and watch the children.

Mother denied any drug use. She admitted using marijuana in the past but not often, and not in front of the children. She claimed she had stopped using marijuana.

### d. *Last-Minute Information*

In a last-minute report to the juvenile court, DCFS noted that the children were more comfortable and relaxed with Father. Tyler stated he was feeling good about living with Father. Annika said she felt truly grateful, relieved, and as if pressure was lifted from her shoulders. The two reported that Mother had pressured them to lie for her and defend her from allegations against her.

### 2. *Mother's Testimony*

Mother was the sole witness at the adjudication hearing, and her testimony was largely consistent with her statements to DCFS. She denied ever using corporal punishment on her children, the one exception being when

she "tapped" Tristan on the head with a paperback book. She claimed she did this after she repeatedly asked Tristan to stop playing video games and read the book, to no avail.

Mother was aware of the children's claims she used physical discipline on them. She stated she was "beyond concerned" about their comments. Mother believed the children were confused and their reality and perception had been altered by Father. She admitted pinching the children on one or two occasions, but she did not believe pinching was corporal punishment. Mother denied ever leaving the children without adult supervision.

## C. *The Juvenile Court's Ruling*

Following the hearing, the juvenile court sustained the petition as to Mother. The court stated that she presented well and was obviously intelligent and articulate, but that the court found her testimony not credible. It found that the children were suffering as a result of Mother's conduct and that she was deflecting her culpability onto Father.

Turning to disposition, the court removed the children from Mother and released them to Father's custody. It adopted a proposed Court Ordered Case Plan for Mother, requiring her to complete a parenting class, participate in individual counseling and conjoint counseling with the children, and submit to on-demand drug testing on reasonable suspicion of drug use. Mother timely appealed.

## DISCUSSION

Mother contends there was insufficient evidence to support either the juvenile court's jurisdictional findings or its dispositional order removing the children from her custody. We review a juvenile court's findings supporting jurisdiction and underlying removal orders for substantial evidence. (*In re David M.* (2005) 134 Cal.App.4th 822, 828; *In re Heather A.* (1996) 52 Cal.App.4th 183, 193.) We "view the evidence in the light most favorable to the trial court's order, drawing every reasonable inference and resolving all conflicts in support of the judgment." (*In re Marina S.* (2005) 132 Cal.App.4th 158, 165.) We do not reassess the credibility of witnesses or reweigh the evidence. (*In re Daniel G.* (2004) 120 Cal.App.4th 824, 830.)

### A. *Jurisdictional Findings*
#### 1. *Mother's Physical Abuse of the Children*

Mother challenges the sufficiency of the evidence to support the juvenile court's findings concerning her physical abuse of the children. Under Section 300(a), the juvenile court's jurisdiction extends to a child who has suffered, or is at a substantial risk of suffering, "serious physical harm inflicted nonaccidentally . . . by the child's parent or guardian." (*Ibid.*) "For purposes of this subdivision, a court may find there is a substantial risk of serious future injury based on the manner in which a less serious injury was inflicted, a history of repeated inflictions of injuries on the child . . . , or a combination of these and other actions by the

12

parent or guardian that indicate the child is at risk of serious physical harm."[6] (*Ibid.*)

In contending the evidence was insufficient to support jurisdictional findings under Section 300(a), Mother raises two arguments. First, she claims her physical discipline of the children with a belt, with a sandal, and by pinching, constituted permissible, reasonable parental discipline. A parent's use of corporal punishment falls within the scope of the parental right to discipline if: (1) the parent acted with a genuine disciplinary motive; (2) "the discipline was 'warranted by the circumstances'"; and (3) "'the amount of punishment was reasonable . . . .'" (*In re D.M.* (2015) 242 Cal.App.4th 634, 641.)

The parties debate whether Mother was required to argue and prove the applicability of the reasonable parental discipline doctrine in the juvenile court, or whether DCFS had the burden to show this doctrine did not apply. We need not decide who bore the burden below, however, as at least some of Mother's conduct exceeded the limits of reasonable parental discipline. Initially, Mother does not contend that the incident in which she hit Tristan on his head with a book constituted permissible discipline. Moreover, the record supported that Mother pinched the children on their legs, arms, or ears, on multiple occasions, sometimes with

---

[6] While the operative petition included physical-abuse-related allegations under Section 300(b)(1) as well, the parties do not argue that the analysis of the issue would be any different under that provision.

sufficient force to leave marks. Given the significant physical pain a child is likely to suffer when pinched to the point of bruising, this punitive technique by Mother went beyond the scope of permissible discipline.[7] (See *In re Benjamin D.* (1991) 227 Cal.App.3d 1464, 1472 [finding substantial risk of serious physical harm to child based in part on father's frequent pinching of child's arms and stomach, sometimes causing bruising]; *Gonzalez v. Santa Clara County Dept. of Social Services* (2014) 223 Cal.App.4th 72, 92 ["the presence of lasting bruises or other marks may support a finding that a parent crossed the line between permissible discipline and reportable abuse"].)

Next, Mother argues that her violent conduct toward the children was too remote and unlikely to recur, and thus that they were not subject to a substantial risk of harm at the time of the adjudication hearing. We disagree. Mother's use of excessive violence against the children was not remote. About one year before the adjudication hearing, Mother engaged in significant violence against the children, hitting Tristan with a book on different parts of his body, including his head, and grabbing Alana by her hair and pushing her, causing her head to hit the door and leaving visible scratch marks on her. Less than a month before the

_____

[7] Because we conclude that at least some of Mother's conduct could not be seen as reasonable parental discipline, we need not address her contention that the court erroneously believed that pinching children or hitting them with belts or sandals always constituted physical abuse.

hearing, Tyler reported Mother would now "pop" the children in the mouth in order to discipline them, and that Mother had hit Alana on the mouth and pinched her "a couple months back." Unsurprisingly, the children reported continuing to fear Mother's anger. Thus, Mother's relatively recent conduct supported a finding that she posed a continuing risk of harm to the children. (See *In re T.V.* (2013) 217 Cal.App.4th 126, 133 ["A parent's past conduct is a good predictor of future behavior"].)

Mother's responses to the children's reports about her violence suggested she was unlikely to abandon her disciplinary methods. Mother consistently denied employing physical discipline against the children, admitting only to pinching, which she did not consider corporal punishment. While she acknowledged hitting Tristan with a book, she minimized the incident, claiming she merely "tapped" him on the head. Rather than accept responsibility for her actions, Mother attempted to lay the blame for her difficulties with the children on Father. Such an approach by an offending parent does not inspire confidence in the parent's willingness or ability to change. (See *In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197 ["One cannot correct a problem one fails to acknowledge"]; *In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044 [parent's denial is relevant factor in determining whether parent is likely to modify his or her behavior].) In short, substantial evidence supported the juvenile court's jurisdictional findings based on Mother's physical abuse of the children.

15

## 2. *Risk of Physical Harm Based on Mother's Neglect of Tristan's Mental Health*

Mother argues the evidence was insufficient to support juvenile court jurisdiction based on her neglect of Tristan's need for mental health services under Section 300(b)(1).  As relevant here, that provision extends the court's jurisdiction to a child who has suffered or who is at a substantial risk of suffering "serious physical harm or illness . . . by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment . . . ."  (Section 300(b)(1).)

Mother concedes she delayed obtaining mental health services for Tristan but contends there was nevertheless no substantial risk of physical harm to the child at the time of the adjudication hearing.  She claims it was not clear that Tristan's mental health had seriously deteriorated until September 2019.  Mother further claims that once Tristan's struggles became apparent, she did not remain indifferent.  She highlights her September 2019 call for assistance after the child's comment that he did not want to wake up, and her scheduling of his October 2019 intake appointment.  Finally, Mother emphasizes that by November 2019, before the adjudication hearing, Tristan began receiving wraparound services.  We find none of these points persuasive.

Initially, Tristan's need for mental health services was clear long before September 2019.  Mother herself reported

16

that Tristan's behavior began to change in June 2018. She claimed he became withdrawn and anxious, and his grades began to drop from As and Bs to Fs. She further reported Tristan first spoke about suicide in December 2018. That same month, DCFS recommended therapy for all the children. In January 2019, Father found a note on Tristan's phone stating that the child felt like killing himself but was too scared. Mother notes that Tristan denied being depressed, and that his siblings suggested at least some of his prior suicidal comments were not serious. But neither Tristan's self-reporting nor his siblings' assessment should have alleviated concerns about his mental or emotional health, given the troubling changes in his behavior, his apparent suicidal ideations (both communicated and uncommunicated), and DCFS's professional recommendation.

In the face of these concerning indications, Mother did not merely fail to act with sufficient urgency, but intentionally hindered the process of obtaining mental health services for Tristan. When Father tried to enroll the children in therapy in Los Angeles, Mother objected that she wanted to enroll them in Downey, where they went to school. On September 10, 2019, the family court ordered the parents to enroll the children in counseling per DCFS's recommendation. When Father tried to comply with this order by enrolling the children in therapy in Downey, Mother refused to sign the consent forms. And when a social worker encouraged Mother to enroll the children in services

so the case could close, Mother refused to do so because she wanted the case to remain open. Given this evidence of Mother's longstanding disregard for Tristan's mental health in favor of idiosyncratic considerations, her call for emergency assistance in September 2019 and her facilitation of the October 2019 intake appointment did little to show true commitment to his wellbeing.[8]

Contrary to Mother's suggestion, the juvenile court was not bound to conclude that the commencement of wraparound services in November 2019 eliminated the substantial risk to Tristan. At the time of the adjudication hearing, those services had only just begun, and the record does not reveal what effect they had on Tristan, if any. Moreover, Mother initially refused, and later only reluctantly agreed, to cooperate with wraparound services, with the caveat that she would not allow anyone into her home. The juvenile court was entitled to find Mother's grudging, late cooperation unconvincing, and insufficient to assure the court Mother would continue to obtain necessary services for Tristan absent court intervention. (See *In re Roxanne B.* (2015) 234 Cal.App.4th 916, 922 (*Roxanne B.*) [juvenile court had good reason to believe that parents would

---

[8] While Mother suggests she made prior attempts to obtain mental health services for Tristan but was unsuccessful due to insurance problems, she provides only her own statements in support. The trial court did not find Mother credible, and we may not second-guess its assessment. (See *In re Daniel G.*, *supra*, 120 Cal.App.4th at 830.)

cease child's treatment and ignore her obvious mental health needs despite their recent cooperation with DCFS; "this short period of change does not absolve concerns for [the child]'s safety in the context of almost two years of medical neglect," especially given parents' "resistance toward DCFS"].)  Accordingly, substantial evidence supported the juvenile court's jurisdictional findings under Section 300(b)(1) based on Mother's neglect of Tristan's need for mental health services.

### 3. *Risk of Emotional Harm due to Mother's Neglect of Tristan's Mental Health*

### a. *Applicable Law*

Under Section 300(c), the juvenile court's jurisdiction extends to a child who "is suffering serious emotional damage, or is at substantial risk of suffering serious emotional damage, evidenced by severe anxiety, depression, withdrawal, or untoward aggressive behavior toward self or others, as a result of the conduct of the parent . . . ." (*Ibid.*) This provision "sanctions intervention by the dependency system in two situations: (1) when parental action or inaction causes the emotional harm, i.e., when parental fault can be shown; and (2) when the child is suffering serious emotional damage due to no parental fault or neglect, but the parent or parents are unable themselves to provide adequate mental health treatment." (*In re Alexander K.* (1993) 14 Cal.App.4th 549, 557.)  "In a situation involving parental 'fault,' the petitioner must prove three things: (1)

19

the offending parental conduct; (2) causation; and (3) serious emotional harm or the risk thereof, as evidenced by severe anxiety, depression, withdrawal or untoward aggressive behavior." (*Ibid.*)

### b. *Analysis*

Mother challenges the sufficiency of the evidence to support the juvenile court's jurisdiction under Section 300(c) based on her neglect of Tristan's mental health. She contends: (1) there was no relevant offending conduct on her part; (2) Tristan suffered no serious emotional damage; and (3) there was no causal connection between any offending conduct by her and any emotional damage in Tristan.

In arguing there was no substantial evidence of offending conduct on her part, Mother repeats her contentions regarding the medical-neglect findings under Section 300(b)(1). We reject those contentions for the reasons discussed above.

As for serious emotional damage, Mother argues the evidence did not support this element because it did not show that Tristan experienced severe anxiety, depression, withdrawal, or untoward aggressive behavior. We disagree. The record supported that Tristan suffered from suicidal ideations over a period of several months, culminating in his hospitalization. (See *Roxanne B.*, *supra*, 234 Cal.App.4th at 921 [child's suicidal ideations may support finding of serious emotional damage under Section 300(c)].) And while Tristan denied feeling depressed or anxious, Mother herself

expressed concern about his emotional state. She described Tristan's behavioral changes beginning in 2018, with his grades dropping from As and Bs to Fs. She reported that all her children, Tristan included, became "withdraw[n]" and demonstrated "anxiety" and lack of interest. Tristan's emotional distress was more severe, however, causing even his siblings to take note. All three of Tristan's siblings were aware of his multiple suicidal threats and related comments. Annika thought Tristan was "depressed." She expressed concern about his changed behavior, noting he used to enjoy school and spending time with family, but now was edgy, did not enjoy school or his family, and would lock himself in his room. While many of these symptoms may be common in teenagers, especially those exposed to an acrimonious divorce, a reasonable factfinder could conclude that the severity and combination of these symptoms in Tristan, particularly with his lasting, expressed suicidal ideations, exceeded normal bounds.

Turning to causation, Mother claims the parents' divorce, rather than any neglect by her, caused Tristan's emotional harm. But while the parents' divorce likely triggered Tristan's distress, the juvenile court reasonably concluded that Mother's interference with his ability to receive necessary mental health services caused his issues to persist. (See *Roxanne B.*, *supra*, 234 Cal.App.4th at 923 [Section 300(c) "'authorizes the taking of jurisdiction . . . where the parent's actions are the cause of the child continuing to suffer the emotional damage . . . .'"], quoting 1

21

Seiser et al., Seiser & Kumli on Cal. Juvenile Courts Practice and Procedure (2014 ed.) Grounds for Dependency Jurisdiction, § 2.84[4].)

In *Roxanne B.*, *supra*, 234 Cal.App.4th at 923, the Court of Appeal upheld findings under Section 300(c) based on the parents' failure to provide their daughter timely access to mental health services to treat her depression. The court noted that despite repeated professional admonishments that the child needed counseling, the parents failed to take her emotional problems seriously and did not provide her with consistent access to services. (*Ibid.*) This disregard for the child's needs, the *Roxanne B.* court concluded, caused her to continue to suffer from depression, as evidenced by increased incidents of suicidal ideation and hospitalizations. (*Ibid.*)

The circumstances of this case are similar. As discussed, Tristan had a clear need for mental health services, supported by a professional recommendation for those services, and ultimately, a court order mandating them. Yet the record supports that Mother disregarded the child's needs for more than a year after she began having concerns about his emotional state, going so far as to intentionally frustrate Father's attempts to enroll him in mental health services. Left without professional help, Tristan did not improve, and was ultimately hospitalized following additional suicidal comments. This evidence supported the juvenile court's finding that Mother's neglect caused Tristan's emotional issues to persist. (See *Roxanne*

22

*B.*, *supra*, 234 Cal.App.4th at 923.) In sum, the evidence supported the juvenile court's findings under Section 300(c).

### 4. *Risk of Harm Due to Mother's Substance Abuse*

Mother argues the evidence was insufficient to support jurisdiction under Section 300(b)(1) based on her substance abuse. This provision, discussed above in the context of medical neglect, additionally extends the juvenile court's jurisdiction to a child who is at a substantial risk of suffering serious physical harm "by the inability of the parent . . . to provide regular care for the child due to the parent's . . . substance abuse." (Section 300(b)(1).)

Mother asserts there was insufficient evidence to show that she was a substance abuser. She further asserts the evidence established no link between any substance abuse and a risk of serious physical harm to the children. We disagree on both points.

The record sufficiently supported that Mother abused alcohol and marijuana. Tristan reported that Mother drank alcohol almost every day. He noted Mother used to leave the children alone while she went out to parties and would come home around one or two in the morning, looking as though she had been drinking, and smelling of alcohol. In October 2019, about two months before the adjudication hearing, Mother arrived drunk to pick the children up from Father's home. This evidence tended to rebut any suggestion that

23

Mother had abandoned her excessive drinking by the time of the hearing.

Record evidence supports that Mother abused marijuana, including around the children. Tyler reported seeing her smoke and finding her bag of marijuana. Alana said she had smelled marijuana on Mother and in Mother's bedroom, and stated that Mother kept marijuana in a bedroom drawer and a pipe in the bathroom. Tristan saw Mother smoke out of a pipe on the porch, and could smell her smoke in her bedroom. The children also witnessed Mother's bizarre behavior. They described her behavior as "'odd'" and explained that when she came home from work, she would roll around on the floor, laughing to herself, and acting like a child. This erratic behavior in the presence of the children was indicative of a drug abuse problem, as opposed to limited and controlled drug use. (See *In re Rebecca C.* (2014) 228 Cal.App.4th 720, 726 ["evidence of life-impacting effects of drug use" may support finding of substance abuse problem justifying juvenile court's intervention].) While Mother denied recent use of marijuana at the adjudication hearing, the juvenile court was free to disbelieve her testimony.[9]

---

[9]  Mother cites the holding of *In re Drake M.* (2012) 211 Cal.App.4th 754, that a finding of substance abuse under Section 300(b)(1) requires evidence that (1) the parent had been diagnosed as having a substance abuse problem by a medical professional or (2) the parent has a current substance abuse problem as defined in the Diagnostic and Statistical Manual of Mental Disorders. (*In re Drake M.* at 766.) However, other courts have rejected this formulation as an exclusive definition of
*(Fn. is continued on next page.)*

Mother contends any substance abuse did not create a substantial risk of harm to the children because they were healthy and well cared for, they were free of bruises or markings, they were doing well in school, and Mother was taking them to school each day. The record belies her contentions. The evidence showed that in October 2019, Mother sent an Uber driver to pick the children up from Father's home. Tristan refused to leave with a stranger without mother in the car. Mother then showed up drunk to pick the children up, with Lupe driving her. Because Lupe was in the car, there was no room for Tyler to sit, and Mother had him sit on the floor, without a seatbelt. Additionally, the children reported that on weekends, Mother would go out to drink and party from morning or midday until late at night, leaving Annika to take care of her three siblings, including Tristan, who was contending with emotional problems and suicidal ideations.

Moreover, Mother's characterization of how the children were doing while in her care bears little relationship to the record. While she claims the children

---

substance abuse. (See *In re Christopher R.* (2014) 225 Cal.App.4th 1210 [*Drake M.*'s definition "is not a comprehensive, exclusive definition mandated by either the Legislature or the Supreme Court"]; *In re Rebecca C.*, *supra*, 228 Cal.App.4th at 726.) Regardless, Mother offers no argument regarding the application of *Drake M.*'s definition to this case. She has therefore forfeited any contention in this regard. (See *Sviridov v. City of San Diego* (2017) 14 Cal.App.5th 514, 521 (*Sviridov*) [arguments not developed are forfeited].)

25

were healthy and well cared for, Tristan was struggling with emotional issues and suicidal ideations, yet was not receiving necessary mental health services.  While she claims the children were free of bruises, there was evidence of significant violence by Mother, including hitting Tristan on the head with a book (leaving a red mark on his cheek), grabbing Alana by the hair and pushing her (leaving visible scratch marks on her), and pinching the children to the point of bruising.  While she claims the children were doing well in school, Mother herself expressed concern about Tristan's grades falling from As and Bs to Fs.  And while she claims she was taking the children to school each day, she would sometimes fail to pick them up from Father's home at the end of visits, which sometimes caused them to miss school.  Accordingly, the evidence supported the juvenile court's jurisdiction based on Mother's substance abuse.

### B. *Removal Order*

Mother contends there was no substantial evidence supporting the disposition order removing the children from her custody.  A juvenile court may remove a child from his or her custodial parent if it finds by clear and convincing evidence that there is substantial danger to the physical health, safety, protection, or emotional well-being of the child or would be if the child were returned home, and that there are no reasonable means to protect the child absent removal.  (§ 361, subd. (c)(1).)

26

Mother argues there was no substantial danger to the children for some the same reasons she advances in her challenges to the juvenile court's jurisdictional findings, claiming she: (1) cared for the children, took them to school, and provided them with a safe and clean home; and (2) expressed concern for Tristan's deteriorating mental health, acted quickly when he commented he did not want to wake up, and ultimately enrolled him in wraparound services. These contentions remain unpersuasive in the context of the court's dispositional orders, even when considering the higher standard of proof by clear and convincing evidence. As discussed, Mother showed reckless disregard for Tristan's emotional and mental health needs, and her substance abuse, which led to erratic behavior, placed the children in physical danger and affected her ability to care for them.[10] The juvenile court was also entitled to consider the children's improvement after they had been detained from

_____

[10] Mother questions Father's fitness to care for the children, but at issue here is the juvenile court's decision to remove the children from Mother's custody, not the wisdom of releasing them to Father's custody. Mother also notes that the family court chose not to remove the children from her custody. Yet the juvenile court was not required to defer to the family court on this issue. (See *In re Chantal S.* (1996) 13 Cal.4th 196, 201 [family court provides presumptively fit parents with forum to resolve private custody and visitation disputes, whereas juvenile court provides State with forum to restrict parental behavior or remove children from parents' custody, without presumption of parental fitness].)

27

Mother:  DCFS reported the children were more comfortable and relaxed with Father.  Tyler said he was feeling good about living with Father, and Annika said she felt truly grateful, relieved, and as if pressure had been lifted from her shoulders.

Mother conclusorily asserts there were reasonable alternatives to removal, such as unannounced home visits and continued wraparound services.  She has forfeited any contention in this regard by failing to develop the argument.  (*Sviridov, supra,* 14 Cal.App.5th at 521.)  Moreover, Mother failed to accept responsibility for her behavior and pressured the children to lie for her.  When a social worker encouraged Mother to enroll the children in services so the case could close, Mother refused and indicated a desire to prolong the litigation.  Given Mother's counterproductive posture, the juvenile court was entitled to conclude that no reasonable alternatives to removal existed.

## DISPOSITION

The juvenile court's jurisdictional findings and dispositional orders are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.**

MANELLA, P. J.

We concur:

COLLINS, J.

CURREY, J.